# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

OLGA MEZA,
on behalf of M.P., a minor,

       Plaintiff,

vs.                                                          No. CIV 10-0963 JB/WPL

BOARD OF EDUCATION OF THE
PORTALES MUNICIPAL SCHOOLS,

       Defendant.


BOARD OF EDUCATION OF THE
PORTALES MUNICIPAL SCHOOLS,

       Plaintiff,

vs.                                                          No. CIV 10-0964 JB/WPL

OLGA MEZA,
on behalf of M.P., a minor,

       Defendant.


## <u>MEMORANDUM OPINION AND ORDER</u>

      **THIS MATTER** comes before the Court on Defendant Board of Education of the Portales Municipal Schools' Motion to Stay Implementation of Due Process Hearing Officer's Decision, filed December 3, 2010 (Doc. 7)("Motion"). The Court held a hearing on February 11, 2011. The primary issue is whether the Court should preliminarily enjoin implementation of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 through 1482 ("IDEA") due-process hearing officer's ("DPHO") Final Decision, filed October 8, 2010 (Doc 1-1)("Order"). Because the Defendant Board of Education of the Portales Municipal Schools ("Portales Schools") is likely to

prevail on the merits, and the equities and public policy favor a preliminary injunction, the Court grants the Motion.

## FACTUAL BACKGROUND

The case concerns the education of Plaintiff Olga Meza's son, M.P., a seven-year old child with autism.  Meza contends that Portales Schools did not provide M.P. free appropriate public education ("FAPE") during the 2009-2010 school year.  On April 25, 2010, Meza filed a due-process hearing complaint with the New Mexico Public Education Department ("NMPED").

Under the auspices of the IDEA, a DPHO presided over a hearing addressing Meza's allegations.  Before the hearing and before the DPHO's issuance of her Order, Portales Schools agreed to bring M.P. back into its classrooms when school began in the fall of 2010.  On or about September 10, 2010, at the conclusion of the due-process hearing, the DPHO entered an Order.  The DPHO found that Portales Schools failed to provide M.P. with FAPE when M.P. was on homebound services during the period from March 8, 2010 to the end of the 2009-2010 school year, because Portales Schools failed to provide M.P. with services in his least restrictive environment.  See Order ¶¶ 10, 11, at 18, at 21-22.

The DPHO also stated that, given M.P.'s worsening condition, Portales Schools was required, "at a minimum," to fully implement its autism experts' recommendations for improving non-verbal communications with M.P. and determining the causes of M.P.'s behaviors.  Order at 20-21.  See Order ¶ 35, at 13 (finding Portales Schools failed to "turn to their expert consultants for intensive individualized assistance in addressing Student's needs").

In the Order, the DPHO required Portales Schools to contract with the University of New Mexico Center for Developed and Disability ("CDD") to put together, with the involvement of

Portales Schools and Meza, a team of consultants with expertise in autism ("Consultant Team") to

provide services to M.P.  Order ¶ 1, at 22.  The DPHO authorized the Consultant Team, among other

things, to have access to Portales Schools, observe both M.P. and staff, interview Portales Schools

staff and service providers, recommend changes to M.P.'s program and behavior intervention plan,

review methodologies and implementation of those methodologies by Portales Schools staff, and

to "supervise or assist District staff" in the conduct of any evaluations.  Order ¶¶ 1-8, at 22-24.  "As

promptly as possible consistent with the need for observations and review of data, without waiting

for medical evaluation data, the consultant team, together with Student's IEP team,[1] will develop a

_____

[1] Under IDEA, "IEP Team" is defined as follows:

The term "individualized education program team" or "IEP Team" means a group of individuals composed of --

(i) the parents of a child with a disability;

(ii) not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

(iii) not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child;

(iv) a representative of the local educational agency who --

       (I) is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

       (II) is knowledgeable about the general education curriculum; and

       (III) is knowledgeable about the availability of resources of the local educational agency;

(v) an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);

(vi) at the discretion of the parent or the agency, other individuals who have

-3-

new IEP . . . ."  Order ¶ 6, at 24.  "The consultant team will oversee Student's educational program for a one-year period."  Order ¶ 8, at 24.  The DPHO's Order states:

1.      The District will contract with the University of New Mexico Center for Development and Disability [("CCD")] to put together, with the involvement of the District and Parent, a team of consultants with expertise in autism. The team will include an expert skilled in addressing the behavior problems of children with autism, an expert in structuring educational services to children with autism, and a speech and language therapist or other expert in facilitating communication for children with autism.  An important criterion in selecting members of the consultant team will be both their immediate and continuing availability for the work required in this Order.

2.      The consultant team will be given access to this decision, to Student's educational records, to District staff, to Parent, and to Student and will be permitted to observe in Student's classroom, and, if the team decides it is appropriate, and Parent consents, in Student's home.

3.      Qualified members of the consultant team will review the anecdotal data collected by Student's teachers, and perform additional extended observations in the classroom, interview Student's related services providers and Parent to determine the causes of Student's outbursts and other disruptive behavior, or, if that is not possible, to develop a reasonable hypothesis which will allow them to recommend changes in Student's educational program, functional behavioral evaluation, and behavior intervention plan likely to be successful in addressing Student's behaviors and in allowing Student to make educational progress.

4.      The team shall also review the instructional methodologies being used by the teachers to ensure that the methodologies used and the manner in which they are used is appropriate for Student and that these methodologies are being implemented appropriately.

5.      The team will consult with appropriate medical personnel to determine what medical evaluations, if any, are still needed at this time by Student for

---

knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(vii) whenever appropriate, the child with a disability.

20 U.S.C. § 1414(d)(1)(B).

educational purposes, and will suggest medical providers and supervise or assist District staff in supervising the conduct of these evaluations, without cost to the Parent.  A psychiatric evaluation shall not be performed at this time and shall only be performed only if the modifications made based on the team's report prove unsuccessful in addressing Student's behaviors and the team, at that point, finds such an evaluation appropriate to address Student's educational needs.  Informed Parent consent shall be obtained before any medical evaluation is conducted.

6.      As promptly as possible consistent with the need for observations and review of data, without waiting for medical evaluation data, the consultant team, together with Student's IEP team, will develop a new IEP, functional behavioral assessment, and behavior intervention plan for Student.  **If there is a lack of consensus on the team as to the services needed by Student, the consultant team, so long as the Parent agrees, will have the deciding vote.**

7.      The consultant team will provide hands on assistance and training to Student's teachers and will remain actively involved, returning to the District regularly to observe and measure Student's progress, and to make any changes necessary to ensure that Student's program remains appropriate.

8.      The consultant team will **oversee** Student's educational program for a one-year period.  Visits should be monthly at a minimum after the initial intensive evaluation of Student's needs.  After that time, the IEP team will resume control.  Of course, the IEP team should consult with autism experts of the District's choice to the extent such assistance remains necessary to provide Student a free, appropriate public education.

Order ¶¶ 1-8, at 22-24 (emphasis added).

## PROCEDURAL BACKGROUND

Portales Schools timely appeals pursuant to NMAC 6.31.2.13(I)(25)(a) the portions of the Order holding against it.  See Portales Municipal School's Complaint for Review of Final Decision of Due Process Hearing Officer, filed October 8, 2010 (Doc. 1)("Complaint").  Meza has not filed an answer to the Complaint, but she has filed an action in federal court seeking attorneys fees associated with the underlying due-process matter.  See No. Civ. 10-0963 WDS/WPL.

Portales Schools' expert in autism-spectrum disorders in childhood and adolescence autism

and school-based interventions for children with autism-spectrum disorder, Dr. Jennifer Rarity, stated in her affidavit that Portales Schools is now addressing the staff's shortcomings in determining the causes of M.P.'s behaviors by improving the staff's data analysis, which will enable them to isolate and identify M.P.'s triggers.  Dr. Rarity further reports that she has "devoted a significant number of hours and effort to working with the Student and his classroom staff so as to assist them in developing and implementing both preventative and reinforcement strategies addressing" M.P.'s behaviors.  Affidavit of Jennifer Rarity ¶ 4, at 2 (executed November 29, 2010), filed December 3, 2010 (Doc. 8-2).

Portales Schools, pursuant to D.N.M.LR.Civ. 7, moves the Court for an order staying implementation of the DPHO's Order.  Portales Schools seeks a preliminary injunction, arguing that it will likely prevail on the merits, because the DPHO exceeded her authority by delegating IDEA decisionmaking authority to the Consultant Team.  Portales Schools further argues that the equities and public policy favor an injunction.

On December 17, 2010, Meza filed Parent's Response in Opposition to District's Motion to Stay Implementation of Due Process Hearing Officer's Decision.  See Doc. 16.  Meza argues that the preliminary injunction which Portales Schools seeks is contrary to IDEA's statutory provisions. Meza further argues that the equities weigh against granting a preliminary injunction and that Portales Schools is unlikely to prevail on the merits.

On December 20, 2010, Portales Schools filed its Reply to Response in Opposition to Portales Schools' Motion to Stay Implementation of Due Process Hearing Officer's Decision.  See Doc. 20.  Portales Schools clarified that it sought a preliminary injunction and not a stay-put order under IDEA. Portales Schools further asserted that the Court is permitted to enjoin the DPHO's

Order.

At the hearing, Portales Schools contended that the DPHO's Order violated the DPHO's statutory authority, because it impermissibly granted the Consultant Team expansive powers, including the power to supervise Portales Schools staff, assign Portales Schools staff and personnel training, and to make any changes to M.P.'s education program the Consultant Team may deem advisable. <u>See</u> Transcript of Hearing at 6:6-12 (taken February 11, 2011)(Church)("Tr.").[2] Portales Schools further asserted that the Consultant Team is permitted, for a period of one year, to determine the extent and cost of its efforts. <u>See</u> <u>id.</u> at 6:13-17 (Church). Portales Schools also asserted that the Consultant Team would not answer to any member of Portales Schools or the NMPED. <u>See</u> <u>id.</u> at 7:19-23 (Church). Portales Schools contended that the Order impermissibly gives the Consultant Team control over M.P.'s IEP, because the Order gives the Consultant Team, subject to Meza's consent, the "the deciding vote" over any disputes between the Consultant Team and the IEP Team. Order ¶ 6, at 24. <u>See</u> Tr. at 8:8-10:4 (Church). Portales Schools represented that it has begun contracting process with CDD and that it has provided M.P.'s records to CDD. <u>See</u> Tr. at 6:20-24 (Church).

While Portales Schools' Motion appeared to seek a preliminary injunction of the DPHO's Order in its entirety, Motion at 3 ("[T]he District prays for entry of an Order staying implementation of the DPHO's Final Decision . . . ."), at the hearing, Portales Schools scaled back its request. Portales Schools represented that its primary concern with the DPHO's Order is that the Order gives the Consultant Team control and oversight over Portales Schools' staff, and that, under the Order,

---

[2] The Court's citations to the transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

the Consultant Team displaces the IEP Team.  See Tr. at 36:17-22(Church)("We'd really like to hear that perhaps we can have UNM on the campus but they can't have all these powers that the hearing officer has given them."); id. at 36:23-37:16 (Court, Church)(Portales Schools stating that the Consultant Team's oversight and being given the deciding vote over disputes "are certainly the two major areas" of concern).  Portales Schools stated that it did not have an issue with the Consultant Team having access to Portales Schools staff, observing M.P. and staff, or reviewing instructional and implementation methodologies.  See Tr. at 37:25-38:5, 39:3-11 (Court, Church).  Portales Schools has an issue, however, with permitting the Consultant Team to interview its staff and service providers, because the Consultant Team has aligned itself with Meza in this matter, as it testified on Meza's behalf at the administrative hearing.  See Tr. at 38:6-20 (Court, Church).  Portales Schools further represented that it did not object to the Consultant Team making recommendations to the IEP Team, so long as the IEP Team decided whether to accept the recommendations.  See Tr. at 38:21-39:1 (Court, Church).

## LAW REGARDING PRELIMINARY INJUNCTION

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotations omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the moving party must establish that: (i) "[it] will suffer irreparable injury unless the injunction issues"; (ii) "the threatened

injury . . . outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) "the injunction, if issued, would not be adverse to the public interest"; and (iv) "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  See Winter v. Natural Res. Defense Council, Inc., 129 S. Ct. 365, 374 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating that those equitable factors weigh in its favor.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'" Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005)(quoting Univ of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). The United States Court of Appeals for the Tenth Circuit has "identified the following three types of specifically disfavored preliminary injunctions . . . : (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004)(en banc), aff'd on other grounds, 546 U.S. 418, 126 (2006))(internal quotation marks omitted).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d at 975).  With respect to preliminary injunctions that will change the status quo, "the movant has an

even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation mark omitted).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." U.S. ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd, v. Marnatech Enter., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING THE IDEA

The IDEA provides a comprehensive scheme to ensure provision of special education to students with disabilities. IDEA's overarching purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). IDEA has seen multiple amendments, including a recent amendment effective July 2005.

### 1. Policy Underlying the IDEA.

The IDEA embodies "a strong federal policy to provide an appropriate education for every

[disabled] child."  <u>Kruelle v. New Castle County Sch. Dist.</u>, 642 F.2d 687, 690 (3d Cir. 1981).  The

United States Court of Appeals for the Third Circuit in <u>Kruelle v. New Castle County School</u>

<u>District</u> cites various passages of legislative history in explaining that Congress passed the IDEA

to further three interrelated purposes.  <u>See</u> 642 F.2d at 690.  First,

> Congress sought to secure by legislation the right to a publicly-supported equal
> educational opportunity which it perceived to be mandated by <u>Brown v. Board of</u>
> <u>Education</u>, and explicitly guaranteed with respect to the handicapped by two seminal
> federal cases, <u>Pennsylvania Association for Retarded Children v. Pennsylvania</u> and
> <u>Mills v. Board of Education.</u>

<u>Kruelle v. New Castle County Sch. Dist.</u>, 642 F.2d at 690-91 (citing S. Rep. No. 168, 94th Congress,

1st Sess. 6, reprinted in U.S. Code Cong. & Ad. News 1425, 1430)(footnotes omitted).

Second, "Congress intended the provision of education services to increase the personal

independence and enhance the productive capacities of handicapped citizens."  <u>Kruelle v. New</u>

<u>Castle County Sch. Dist.</u>, 642 F.2d at 691 (citation and footnote omitted).  Third, Congress

"acknowledged the need for an expanded federal fiscal role to aid state compliance with the court

decisions and to assure protection for the rights of handicapped children."  642 F.2d at 691.

According to the Third Circuit in <u>Kruelle v. New Castle County School District</u>, Congress employed

a cost-benefit philosophy: "[i]nstead of saddling the public agencies and taxpayers with the

enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally

acceptable institutionalized existence, Congress reasoned that the early injection of federal money

and provision of educational services would remove this burden by creating productive citizens."

642 F.2d at 691 (citing S. Rep. No. 168, 94th Congress, 1st Sess., reprinted in U.S. Code Cong. &

Ad. News, 1425, 1434).

2.      **The IDEA's Basic Structure.**

The IDEA is, on the surface, a funding statute.  The Supreme Court of the United States has

pointed out, however, that the IDEA "confers upon disabled students an enforceable substantive

right to public education in participating States."  Honig v. Doe, 484 U.S. 305, 310 (1988).[3]  The

Office of Special Education Programming of the United States Department of Education administers

IDEA.  See 20 U.S.C. §§ 1406, 1417.  States decide whether to participate in the IDEA and accept

the funds that it provides.  At present, all states participate.  New Mexico was the last state to accept

federal funding under the IDEA.  See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,

458 U.S. 176, 183-84 (1982).

The IDEA defines the term "free appropriate public education":

The terms "free and appropriate public education" means special education and
related services that –

(A)  have been provided at public expense, under public supervision and
direction, and without charge;

(B)  meet the standards of the State educational agency;

(C)   include an appropriate preschool, elementary, or secondary school
education in the State involved; and

(D)  are provided in conformity with the individualized education programs
required under section 1414(d) of [IDEA].

20 U.S.C. § 1401(8).

The IDEA confers an "enforceable substantive right to public education."  Honig v. Doe, 484

U.S. at 310 (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 176

_____

[3] Honig v. Doe discusses the Education for All Handicapped Children Act of 1975, PL
94-142, 89 Stat. 773, which was the predecessor to the IDEA.  The Education for All Handicapped
Children Act was reorganized and renamed as the IDEA in 1990.  See 20 U.S.C.A. § 1400.

n.1).  Through the IDEA, Congress chose a highly detailed procedural scheme to ensure that

children with disabilities receive the special education and related services they need.  See Bd. of

Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06.  The Honorable Christina

Armijo, United States District Judge for the District of New Mexico, has recognized that the IDEA

scheme of ensuring that all children with disabilities receive a FAPE involves parents, schools, and

states:

> The IDEA additionally envisions a collaborative effort by which parents, educators,
> state and others work together not just to create a personalized [individual education
> plan ("IEP")] through which the individual child will receive the free appropriate
> public education to which he or she is entitled, but also to effect systemic change.

Chavez v. Bd. of Educ. of Tularosa Municipal Schs., 614 F. Supp. 2d 1184, 1200 (2008)(Browning,

J.)(quoting Sanders v. Santa Fe Pub. Schs., 383 F. Supp. 2d 1305, 1310 (D.N.M. 2004)(Armijo,

J.)(citing 20 U.S.C. § 1414(d)(1)-(4))).

### 3.  Standard of Review for IDEA Administrative Decisions.

The United States District Court undertakes a "modified de novo" review of the underlying

IDEA administrative decisions.  Erickson v. Albuquerque Pub. Schs., 199 F.3d 1116, 1120 (10th

Cir. 1999).  The district court must "independently review the evidence contained in the

administrative record, accept and review additional evidence if necessary, and make a decision based

on a preponderance of the evidence, while giving 'due weight'  to the administrative proceedings

below."  Murray v. Montrose County Sch. Dist. RE-1J, 51 F.3d 921, 927 (10th Cir. 1995).  The

district court reviewing the final state administrative IDEA decision reviews questions of law de

novo.  See O'Toole v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, 144 F.3d 692, 698 (10th Cir.

1998).  "The burden of proof in an administrative hearing challenging an IEP is properly placed

upon the party seeking relief."  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005).

4.      **Supplementation of the Administrative Record.**

The IDEA provides that the need for additional evidence is within the court's discretion.  The

IDEA apparently requires, however, an evidentiary hearing to determine what evidence the court

should consider adding to the record.  See 20 U.S.C. § 1415(i)(2)(C)(ii)(stating that the court "shall

hear additional evidence at the request of a party").  In light of this mandatory language, the Court

observes that there is some tension between 20 U.S.C. § 1415(i)(2)(C)(ii) and the exhaustion

requirement under the IDEA, which requires parties to present arguments and evidence for

administrative review before presenting them to a federal court.  The Court believes, however, that

the tension is resolved through the "modified de novo review" of a plaintiffs' IDEA claims.  Murray

v. Montrose County Sch. Dist. RE-IJ, 51 F.3d at 927 (explaining that "[t]he district court must

therefore independently review the evidence contained in the administrative record, accept and

review additional evidence, if necessary, and make a decision based on the preponderance of the

evidence, while giving 'due weight' to the administrative proceedings below").

5.      **Enforcing Administrative Orders Under the IDEA's Stay-Put Provision**.

IDEA's stay-put provision, 20 U.S.C. § 1415(j), provides, in pertinent part:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless
> the State or local educational agency and the parents otherwise agree, the child shall
> remain in the then-current educational placement of the child, or, if applying for
> initial admission to a public school, shall, with the consent of the parents, be placed
> in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j).  The statutory stay-put provision thus seeks to maintain the status quo during

the administrative and judicial proceedings that IDEA provides.  "The purpose of the stay-put

provision is to prevent school districts from 'effecting unilateral change in a child's educational

program'" during the pendency of  IDEA proceedings.  Erickson v. Albuquerque Pub. Schs., 199

F.3d at 1121 (quoting Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83 (3d Cir. 1996)).

The Tenth Circuit has recognized that IDEA's stay-put "has been construed to impose 'an automatic statutory injunction' requiring that the child's then-current educational placement be maintained . . . ." Miller v. Albuquerque Pub. Schs., 565 F.3d 1232, 1252 n.13 (10th Cir. 2009). In Laster v. District of Columbia, 394 F. Supp. 2d 60 (D.D.C. 2005), the United States District Court for Portales Schools of Columbia stated:

> A parent can invoke the stay put provision when the school system proposes "a fundamental change in, or elimination of, a basic element of the [then-current educational placement]." Lunceford v. Dist. of Columbia Bd. of Educ., 745 F.2d 1577, 1582 (D.C. Cir. 1984). A parent moving for a stay put injunction "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change to qualify as a change in educational placement." Id.

Laster v. District of Columbia, 394 F. Supp at 64. IDEA's stay-put provision becomes applicable only when a change in a child's placement is proposed. See Moss v. Smith, 794 F. Supp. 11, 14 (D.D.C. 1992). See DeLeon v. Susquehanna Cmty. Sch. Dist., 747 F.2d 149, 152 (3d Cir. 1984)(stating that the threshold question is whether there is a proposed change in "educational placement").

Once a change in educational placement has been proposed, IDEA's stay-put provision operates as a substitute for traditional preliminary injunction analysis. In Casey K. ex rel. Norman K. v. St. Anne Community High School District No. 302, 400 F.3d 508 (7th Cir. 2005), the United States Court of Appeals for the Seventh Circuit, in an opinion authored by the Honorable Richard A. Posner, United States Circuit Judge, stated: "The stay-put provision has been interpreted as imposing an automatic statutory injunction . . . , like the automatic stay in bankruptcy." Id. at 511 (citing Honig v. Doe, 484 U.S. at 326-27).

-15-

"The law is clear that an administrative decision in favor of the parents is equivalent to an agreement between the state agency and the parents and, therefore, represents the child's current education placement for purposes of IDEA's 'stay-put' provision." Bd. of Educ. of Albuquerque Pub. Schs. v. Miller, No. CIV.05-487 MCA/LFG, 2005 WL 6168485, at *4 (D.N.M. July 22, 2005)(Armijo, J.)(citing 34 C.F.R. § 300.514(c)); Sch. Comm. of Town of Burlington v. Mass. Dep't of Educ., 471 U.S. 359, 373 (1985); Bd. of Educ. v. Schutz, 290 F .3d 476, 482-84 (2d Cir. 2002); Ga. State Dep't of Educ. v. Derrick C., 314 F.3d 545, 552 (11th Cir. 2002); Susquenita Sch. Dist. v. Raelee S., 96 F.3d at 83-84; Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings, 903 F.2d 635, 641 (9th Cir. 1990); Bd. of Educ. of Pine Plains Cent. Sch. Dist. v. Engwiller, 170 F. Supp. 2d 410, 413-14 (S.D.N.Y. 2002)).  Judge Armijo explained in Miller v. Board of Education of the Albuquerque Public Schools:

> The Court also must keep in mind that this case presents an unusual situation where the Plaintiffs are appealing from an administrative proceeding at which they prevailed and received some form of equitable relief as to most of the substantive issues. . . .  [T]he IDEA does not give Plaintiffs the right to bring a civil action for judicial review of the administrative proceedings conducted pursuant to that statute unless and until they are "aggrieved" by the result of those proceedings.  See 20 U.S.C. § 1415(i)(2)(A); Robinson v. Pinderhughes, 810 F.2d 1270, 1275 (4th Cir. 1987).  It follows that there is no basis for the Court to review evidentiary rulings with respect to those issues on which the AAO found in Plaintiffs' favor and awarded adequate relief.
>
> . . . .
>
> That a student is aggrieved by a school district's failure to comply with an administrative tribunal's decision in favor of the student is a separate and distinct claim that may rest on an entirely different legal theory than the relatively straightforward IDEA. . . . See, e.g., Robinson, 810 F.2d at 1274-75 (concluding that such non-compliance can be addressed under 42 U.S.C. § 1983).

2006 WL 2786759 at *14, 16.

-16-

## ANALYSIS

After careful review of the IDEA's complex statutory scheme, the Court concludes, as have all other courts that have addressed the issue, that the IDEA's stay-put provision does not displace the federal judiciary's ability to enter a preliminary injunction.  When the Court analyzes whether a preliminary injunction properly lies, the Court is convinced that Portales Schools will likely be able be successful in proving that the DPHO exceeded her statutory authority when she delegated ultimate authority over M.P.'s FAPE to a third party and M.P.'s IEP Team.  Because the balance of the equities and public policy also favor the Court staying at least portions of the DPHO's Order, the Court will grant in part Portales Schools' request for a preliminary injunction.  The Court, therefore, grants in part Portales Schools' request for a preliminary injunction, as the request was modified at the motion hearing.

## I.   THE IDEA'S STAY-PUT PROVISION DOES NOT DISPLACE THE COURT'S ABILITY TO GRANT PRELIMINARY INJUNCTIONS.

Portales Schools seeks a preliminary injunction, enjoining implementation of at least portions of the DPHO's Order.  Meza contends that the Court cannot override IDEA's stay-put provision with an order granting injunctive relief.  Meza cites no authority in support of her contention, relying instead on IDEA's provisions for judicial review and stay-put injunctions to argue that "IDEA delineates a specific judicial review process, including interim stay-put relief," and that "[t]he process set forth by Congress does not contemplate the Court making a pre-determination at this juncture to overturn the" DPHO's Order.  Response at 3.

The Court may enjoin the DPHO's Order.  Courts uniformly recognize that parties may use preliminary injunctions to forestall or alter IDEA's stay-put injunctions.  In Wagner v. Board of Education of Montgomery County, 335 F.3d 297 (4th Cir. 2003), the United States Court of Appeals

for the Fourth Circuit stated:

> First, section 1415(j) allows the parties to effect a change in placement simply by agreeing upon the new placement. See 20 U.S.C. § 1415(j) (providing that the child shall remain in the then-current educational placement "unless the State or local educational agency and the parents otherwise agree"). Second, when agreement cannot be reached, a party may seek a preliminary injunction from the district court, changing the child's placement. Under section 1415(i)(2)(B)(iii), the district court is empowered "[i]n any action brought under this paragraph" to "grant such relief as the court determines is appropriate." Id. § 1415(i)(2)(B)(iii). As the Supreme Court stated in Honig v. Doe, 484 U.S. 305 . . . (1988), this means that the court has the equitable power to order a change in placement upon a sufficient showing. See id. at 327-28 . . . (interpreting the "stay put" provision of the [Education of the Handicapped Act ("EHA"), the former title of IDEA]). The difference between section 1415(j) and section 1415(i)(2)(B)(iii) is that any preliminary injunction entered under section 1415(i)(2)(B)(iii) is by no means automatic. The party seeking such an injunction bears the burden of demonstrating entitlement to such relief under the standards generally governing requests for preliminary injunctive relief. That more is required to effect a change in placement pursuant to section 1415(i)(2)(B)(iii) than the maintenance of placement pursuant to section 1415(j) is consistent with the presumption created by Congress that a child should remain in the then-current educational placement. See id. at 328 . . . . But the availability of the section 1415(i)(2)(B)(iii) safety-valve is also consistent with the understanding that circumstances do exist where maintaining the child in the then-current educational placement would cause irreparable harm. Cf. id. at 328 . . . (stating that the "stay put" provision of the EHA "effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others"). District courts should, of course, be extremely cautious when considering whether to order a change in a child's placement under section 1415(i)(2)(B)(iii), given the statute's strong presumption, expressed in section 1415(j), in favor of the status quo and its provision for administrative hearing before adjudication in federal court. See id. at 327 . . . .

335 F.3d at 302-03 (emphasis added).

Because Portales Schools seeks to modify or forestall the DPHO's Order, the Court must balance the equities. In N.D. ex rel. parents acting as guardians ad litem v. Hawaii Deptartment of Education, 600 F.3d 1104 (9th Cir. 2010), the United States Court of Appeals for the Ninth Circuit addressed the question whether a "district court applied the wrong standard and should have applied

the stay-put provision's automatic injunction standard rather than the preliminary injunction standard." 600 F.3d at 1111. In that case, disabled students sought a preliminary injunction to prevent Hawaii from shutting down public schools on seventeen Fridays and concurrently furloughing the teachers. The students "argue[d] that the stay-put provision's automatic injunction should apply instead of the balancing test required for preliminary injunctions." 600 F.3d at 1111-12. The Ninth Circuit held that -- unlike the implementation of a stay-put injunction, which is automatic -- a district court should apply the balancing test required for preliminary injunctions when "the motion is for a preliminary injunction that affects a stay-put invocation, not the stay-put invocation itself." 600 F.3d at 1112 (citing Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d at 1180).

Similarly, a party may seek to modify a stay-put order through a preliminary injunction, in which case a "district court [i]s required to examine the validity of the existing 'stay put' order and to balance the equities." Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d 1176, 1180 (9th Cir. 2002). See Wagner v. Bd. of Educ. of Montgomery County, 335 F.3d at 302 (treating a request for a change in a child's stay-put placement as a request for a preliminary injunction). In Johnson ex rel. Johnson v. Special Education Hearing Office, State of California, the Ninth Circuit stated: "We hold that a request to enjoin a preexisting 'stay put' order is handled appropriately by the district court's application of traditional preliminary injunction analysis." 287 F.3d at 1180. Cf. Joshua A. v. Rocklin Unified Sch. Dist., 559 F.3d 1036, 1037 (9th Cir. 2009)("A motion for stay put functions as an 'automatic' preliminary injunction, meaning that the moving party need not show the traditionally required factors (e.g., irreparable harm) in order to obtain preliminary relief." (citing Drinker ex rel. Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 (3d Cir.

-19-

1996))).

Here, Portales Schools seeks to enjoin the DPHO's order.  Because Portales Schools does not seek to enforce the DPHO's order under IDEA's stay-put provision as an agreement between the parties, cf. Bd. of Educ. of Albuquerque Pub. Schs. v. Miller, 2005 WL 6168485, at *4 ("The law is clear that an administrative decision in favor of the parents is equivalent to an agreement between the state agency and the parents and, therefore, represents the child's current education placement for purposes of IDEA's 'stay-put' provision." (citation omitted)), Portales Schools' motion seeks to change the conditions the DPHO's Order imposes -- i.e. the "motion is for a preliminary injunction that affects a stay-put invocation, not the stay-put invocation itself."  600 F.3d at 1112 (citing Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d at 1180).  Consequently, the Court applies the balancing test required for preliminary injunctions. N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dept. of Educ., 600 F.3d at 1112; Wagner v. Bd. of Educ. of Montgomery County, 335 F.3d at 302-03; Johnson ex rel. Johnson v. Special Educ. Hearing Office, State of Cal., 287 F.3d at 1180.

## II.   THE COURT GRANTS PORTALES SCHOOLS PRELIMINARY INJUNCTIVE RELIEF.

Portales Schools argues that, in fashioning a remedy for perceived, limited IDEA violations, the DPHO exceeded her authority and usurped the IEP Team's function, legal duties, and obligations.  See Complaint, Count Two, at 2-3.  Portales Schools contends that the DPHO's remedy violates applicable federal and state laws and regulations, Portales Schools' policies, and relevant case law.  Portales Schools further contends that implementation of the DPHO's order would require it to expend public funds without the ability to recoup those funds, and to violate state laws and Portales Schools policies, exposing Portales Schools to irreparable harm.  Portales Schools also

asserts that, because the DPHO has exceeded her authority, Portales Schools is likely to succeed on appeal.   Portales Schools asserts, moreover, that M.P. will suffer no harm if the Court issues a preliminary injunction because M.P. is back in school and has remained in school -- as opposed to homebound educational services -- and Portales Schools has continued to contract with experts in autism who are making regular visits to Portales Schools and to M.P.'s classroom and continuing to work with Portales Schools' staff in appropriately addressing M.P.'s needs.   Portales Schools further asserts that an injunction will benefit the public interest, which favors appropriate expenditures of tax payer monies and protection of the policies underlying IDEA.

### A.      PORTALES SCHOOLS WILL LIKELY PREVAIL ON THE MERITS.

Portales Schools' Complaint challenges the DHPO's order on two bases.   Portales Schools contends that: (i) the DPHO should have found that M.P. did not meet her burden of proof concerning the limited deprivation of FAPE during the periods from February 1, 2010 to March 5, 2010, and from March 8, 2010 to the end of the 2009-2010 school year; and (ii) the DPHO exceeded her statutory authority by imposing a remedy that is prospective rather than compensatory in nature, which amounts to an award of compensatory monetary damages, and is in conflict with New Mexico statutory law and Portales Schools policies, and which impermissibly usurps the IEP Team's function, legal duties, and obligations.   See Complaint, Count I and II, at 4-14.   In its Motion, Portales Schools relies only on its second argument -- that the DPHO exceeded her statutory authority.   See Motion at 4.   At the hearing, both parties agreed that the Court should limit its analysis to addressing whether the DPHO exceeded her statutory authority as a matter of law.   See Tr. at 32:2-11 (Court, Stewart); id. at 33:22-34:6 (Court, Church).

### 1.    The DPHO Likely Exceeded Her Statutory Authority.

Portales Schools is likely to prevail in its argument that the DPHO exceeded her authority because she delegated decisionmaking authority to the Consultant Team and the M.P.'s IEP Team, and because she did not tie her decision to the record.  In Reid ex rel. Reid v. District of Columbia, 401 F.3d 516 (D.C. Cir. 2005), on which both parties rely, the United States Court of Appeals for the District of Columbia addressed the question whether courts or hearing officers may award compensatory education services.  The D.C. Circuit found "compensatory education awards fit comfortably within the 'broad discretion' of courts fashioning and enforcing IDEA remedies," stating:

> Under the theory of "compensatory education," courts and hearing officers may award "educational services . . . to be provided prospectively to compensate for a past deficient program."  See G. ex rel. RG v. Fort Bragg Dependent Schs., 343 F.3d 295, 308 (4th Cir. 2003).  Embraced in some form by several circuits, see, e.g., id. at 308-09; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 249 (3d Cir. 1999); Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ., 79 F.3d 654, 656 (7th Cir. 1996); Parents of Student W.[v. Puyallup Sch. Dist., No. 3, 31 F.3d 1489, 1496 (9th Cir. 1994)]; Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 188-89 (1st Cir.1993); Miener v. Missouri, 800 F.2d 749, 753 (8th Cir. 1986); see also Diatta v. District of Columbia, 319 F. Supp. 2d 57, 65 (D.D.C. 2004), this theory builds on the Supreme Court's holding in Burlington that "appropriate" IDEA relief may include reimbursement for parents who place children in private school rather than accept a deficient public school IEP, see 471 U.S. at 369 . . . .  If IDEA permits reimbursement for educational services, courts have reasoned, then it must also allow awards of the services themselves.  See, e.g., Bd. of Educ. of Oak Park & River Forest High Sch., 79 F.3d at 655-56; Pihl, 9 F.3d at 188-89; Miener, 800 F.2d at 753.  Based on such logic, courts have upheld awards requiring, among other things, special programs to make up for prior deficiencies, see, e.g., Diatta, 319 F. Supp. 2d at 65; Westendorp v. Indep. Sch. Dist. No. 273, 35 F. Supp. 2d 1134, 1135-36, 1137 (D. Minn. 1998); cf. G. ex rel. RG, 343 F.3d at 299, 309 (remanding claim of eleven-year-old), and instruction beyond age twenty-one (ordinarily the limit of IDEA coverage, see 20 U.S.C. § 1412(a)(1)(A)), see, e.g., Ridgewood Bd. of Educ., 172 F.3d at 249; Pihl, 9 F.3d at 189-90.
>
> In our view, this extension of Burlington to cover services as well as payments makes eminent sense.  Given the availability of reimbursement for

compensatory instruction, were it impossible to obtain an award of the instruction itself, children's access to appropriate education could depend on their parents' capacity to front its costs -- a result manifestly incompatible with IDEA's purpose of "ensur[ing] that children with disabilities have available to them a free appropriate public education," 20 U.S.C. § 1400(d)(1)(A) (emphasis added).  Even worse, students who remained in public school would lack any effective redress for FAPE denials, even those extending over many years . . . .  To be sure, such students could seek prospective correction of a deficient IEP . . . .  But because the [Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176 (1982)] standard requires only that schools provide "some educational benefit," see Rowley, 458 U.S. at 200 . . . . -- a standard that looks to the child's present abilities -- an IEP conforming to that standard carries no guarantee of undoing damage done by prior violations. . . .  Consistent with Congress's stated aim of "ensur [ing] that the rights of children with disabilities and parents of such children are protected," see 20 U.S.C. § 1400(d)(1)(B), we therefore join our sister circuits and hold that compensatory education awards fit comfortably within the "broad discretion" of courts fashioning and enforcing IDEA remedies, see [Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15-16 (1993).]

401 F.3d at 522-23.

Courts and hearing officers do not, however, have unbounded discretion in fashioning equitable relief under IDEA, and Portales Schools will likely be able to show that the DPHO exceeded her authority when she delegated decisionmaking to the IEP Team and the Consultant Team, and because she did not tie the equitable relief she granted to the record.  Even in the private school situation, the DPHO makes the decision and retains control to change the relief as appropriate; the DPHO did not delegate authority to the private school to make the placement decision.  In Reid ex rel. Reid v. District of Columbia, the D.C. Circuit held that "IDEA hearing officers [may not] authorize IEP teams to 'reduce or discontinue' compensatory education awards." 401 F.3d at 526.  See Board of Educ. of Fayette County, Ky. v. L.M., 478 F.3d 307, 318 (6th Cir. 2007)("We therefore hold that neither a hearing officer nor an Appeals Board may delegate to a child's IEP team the power to reduce or terminate a compensatory-education award.").  The D.C. Circuit reasoned that an IDEA due-process hearing "may not be conducted by an employee of the

State educational agency or the local educational agency involved in the education or care of the child." 401 F.3d at 526 (citing 20 U.S.C. § 1415(f)(3)("A hearing officer . . . shall, at a minimum not be an employee of the State educational agency or the local educational agency involved in the education or care of the child . . . .")). Under IDEA, a

> Local educational agency or LEA means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

34 CFR § 300.28(a). An IEP Team must include "a representative of the local educational agency." See 20 U.S.C. § 1414(d)(1)(B)(iv). The D.C. Circuit reasoned, therefore, that a DPHO could not delegate authority to a IEP Team. By the same measure, a DPHO may not delegate the greater authority of establishing a compensatory education award.

This same reasoning is lethal to the DPHO's Order. The Order requires that "the consultant team, together with Student's IEP team, will develop a new IEP, functional behavior assessment, and behavior intervention plan for Student." Order ¶ 6, at 24. The DHPO's Order thus "runs afoul of this prohibition, for [M.P.'s] IEP team, like any other, must include 'a representative of the local educational agency,' -- presumably an employee of that agency -- and when modifying an award set by the hearing officer the IEP team would in effect exercise the officer's powers." Reid ex rel. Reid v. District of Columbia, 401 F.3d at 244 (quoting 20 U.S.C. § 1414(d)(1)(B)(iv)). It does not save the Order that the IEP Team works in conjunction with the Consultant Team. "Under the statute, the hearing officer may not delegate his authority to a group that includes an individual specifically barred from performing the hearing officer's functions." Reid ex rel. Reid v. District of Columbia,

-24-

401 F.3d at 244 ("It makes no difference that the IEP team also includes non-employees such as Mathew's mother.").

Similarly, the DPHO's delegation of authority to the Consultant Team likely further violated IDEA.  The University of New Mexico is an "arm of the state."  Nieto v. Univ. of N.M., No. CIV 08-0465 JB/WPL, 2010 WL 4929013, at *2 (D.N.M. Oct. 31, 2010)(Browning, J.)(citations omitted).  By giving the Consultant Team extensive involvement with and control over Portales Schools, the DPHO has ordered the Consultant Team to "perform a service function for" Portales Schools, making the Consultant Team in effect a quasi-local educational agency.  34 C.F.R. § 300.28(a)("Local educational agency . . . means a . . . public authority legally constituted within a State . . . to perform a service function for, public elementary or secondary schools . . . .").  Under the Order, the Consultant Team "will provide hands on assistance and training to Student's teachers and will remain actively involved, returning to Portales Schools regularly to observe and measure Student's progress, and to make any changes necessary to ensure that Student's program remains appropriate."  Order ¶ 7, at 24.  The Consultant Team will also "oversee Student's educational program for a one-year period," visiting at least monthly.  Order ¶ 8, at 24.  Under the Order, therefore, the Consultant Team are directly "involved in the education or care of the child."  20 U.S.C. § 1415(f)(3)("A hearing officer . . . shall, at a minimum not be an employee of the State educational agency or the local educational agency involved in the education or care of the child . . . .").  Because IDEA mandates a neutral hearing officer that is not involved in M.P.'s education, Portales Schools is likely to prevail on its claim that the DPHO's delegation of statutory authority to the IEP team and the Consultant Team to fashion appropriate relief further countermands IDEA.

Moreover, under IDEA, a hearing office must also "possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice," and "possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice."  20 U.S.C. § 1415(f)(3)(A)(iii), (iv).  The DPHO made no findings that the members of the Consultant Team possess the abilities to conduct hearings, or to render and to write decisions in accordance with appropriate, standard legal practice.  Because the DPHO did not find that the members of the Consultant Team are qualified to be a hearing officers, she likely exceeded her statutory authority in delegating her authority to them.

In sum, the IDEA creates a complex structure that, while cumbersome, is designed to produce a result that takes into account the interests of a broad array of players in the state and local education regimes.  Congress has separated the DPHO and the IEP Team, giving each separate roles. To collapse the two roles as the DPHO did has upset the careful balance that Congress created. While the DPHO may have hoped to find a more efficient way to address M.P.'s educational needs, the Order is inconsistent with the more cumbersome scheme Congress created.

## 2.     The DPHO Did Not Tie Her Order to the Record.

Finally, the DPHO gave no accounting for the length of the Consultant Team's involvement with M.P.'s education.  The DPHO ordered that "[t]he consultant team will oversee Student's educational program for a one-year period."  Order ¶ 8, at 24.  In Reid ex rel. Reid v. District of Columbia, the D.C. Circuit stated that "awards compensating past violations rely on individualized assessments," 41 F.3d at 524, rejecting the argument "that each hour without FAPE entitles the student to one hour of compensatory instruction, a standard apparently embraced by several courts."  41 F.3d at 523 (citing M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 391-92, 396-97 (3d Cir. 1996)(holding that when

-26-

"a school district . . . knows or should know" that a disabled child's educational program is deficient

yet fails to correct the problem, the child "is entitled to compensatory education for a period equal

to the period of deprivation, but excluding the time reasonably required for the school district to

rectify the problem")).

> As to the remedial provision, the Supreme Court has emphasized that IDEA relief
> depends on "equitable considerations." See Carter, 510 U.S. at 15-16 . . . ;
> Burlington, 471 U.S. at 374 . . . .  Accordingly, "compensatory education is not a
> contractual remedy, but an equitable remedy, part of the court's resources in crafting
> 'appropriate relief.'"  Parents of Student W., 31 F.3d at 1497.  More specifically, as
> the Fourth Circuit has explained, "[c]ompensatory education involves discretionary,
> prospective, injunctive relief crafted by a court to remedy what might be termed an
> educational deficit created by an educational agency's failure over a given period of
> time to provide a FAPE to a student." G. ex rel. RG, 343 F.3d at 309.  Overlooking
> this equitable focus, the Reids' hour-for-hour formula in effect treats compensatory
> education as a form of damages -- a charge on school districts equal to expenditures
> they should have made previously.  Yet "[t]he essence of equity jurisdiction" is " to
> do equity and to mould each decree to the necessities of the particular case.
> Flexibility rather than rigidity has distinguished it." Hecht Co. v. Bowles, 321 U.S.
> 321, 329 . . . (1944).  In keeping with that principle of case-specific flexibility, we
> agree with the Ninth Circuit that "[t]here is no obligation to provide a day-for-day
> compensation for time missed.  Appropriate relief is relief designed to ensure that the
> student is appropriately educated within the meaning of the IDEA."  Parents of
> Student W., 31 F.3d at 1497.

Reid ex rel. Reid v. District of Columbia, 41 F.3d at 523-24.  "[T]he inquiry must be fact-specific

and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide

the educational benefits that likely would have accrued from special education services the school

district should have supplied in the first place."  41 F.3d at 524.

The DPHO found M.P. was deprived of FAPE from February 1, 2010 through March 5,

2010, and from March 8, 2010 to the end of the 2009-2010 school year -- a period of approximately

four to five months.  See Order ¶¶ 11, 33, at 12, 18.  The DPHO gave no accounting for imposing

a one-year remedial period.  It is unclear if the DPHO was relying on some formulaic hour counting

or attempting to craft an "award[] compensating past violations rely[ing] on [an] individualized assessment." Reid ex rel. Reid v. District of Columbia, 41 F.3d at 523-24. Without an explanation why the DPHO chose a length of one year involvement for the Consultant team, the Court is unable to determine if the DPHO appropriately compensated M.P. for his deprivation of FAPE. See Reid ex rel. Reid v. District of Columbia, 41 F.3d at 524 ("[T]he inquiry must be fact-specific and, to accomplish IDEA's purposes").

    In sum, Portales Schools is likely to prevail on the merits. The DPHO likely exceeded her statutory authority by delegating her IEP decisionmaking authority to the IEP Team and the Consultant Team, contrary to IDEA. See 20 U.S.C. § 1415(f)(3)(A). The DPHO also failed to tie to the record the scope of the Order, which provided that the "consultant team will oversee Student's educational program for a one-year period." Order ¶ 8, at 24. The Court therefore concludes that "there is a substantial likelihood [Portales Schools will succeed] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.

### B.   PORTALES SCHOOLS WOULD SUFFER IRREPARABLE INJURY UNLESS THE INJUNCTION ISSUES.

    Portales Schools contends that implementation of the DPHO's Order would require it to expend public funds without the ability to recoup those funds, and to violate state laws and its policies, irreparably harming it. Meza responds that IDEA specifically prohibits regulations and policies that do not conform to the IDEA. See 20 U.S.C. §1407(a)(1). Meza also contends that the cost of implementing the Order would be $38,852.00,[4] for which Portales Schools can seek

---

[4] Meza argues that the $38,852.00 cost of implementing the DPHO Order is a trivial sum and that Meza has exceeded this amount in attorney's fees. The Court is slow to say that $38,852.00 is a nominal sum to Portales Schools. This amount may fund a teacher's salary for a year. See Bureau of Labor and Statistics, Occupational Employment and Wages, May 2009 State Occupational

reimbursement.

Portales Schools will be irreparably harmed if the Court does not issue a preliminary injunction, because the Order requires Portales Schools to violate state law and Portales Schools' policies.   Under New Mexico state law, supervision and correction of unsatisfactory work performance of certified school personnel resides exclusively with the school board and superintendent, and state statute and regulation carefully circumscribe the supervision and discipline. See NMSA 1978, § 22-10A-30 (supervision and correction procedures).  State law requires the State Board of Education to prescribe by regulation the procedures a local school board must follow in supervising and correcting unsatisfactory work performance of school personnel.  See NMSA 1978, § 22-10A-30.  In Portales, the Superintendent may delegate responsibilities to school principals, with those duties including supervision and evaluation of staff members, recommendation for promotion, transfer and discharge of staff, and responsibility for taking precautions to safeguard the health and welfare of students and staff.  See Motion at 18 (citing Policy C-1200 -- School Principals/Building Administrators).  Board policies permit the use of professional consultants from universities, but the Superintendent must approve the use of such consultants before the invitation and arrangement for such visitation.   See Motion at 18 (citing Policy C-2350 -- Administrative Consultants).   The Superintendent controls the activities of such consultants to ensure that relevant laws and policies were followed.  The Order requires Portales Schools to bypass these procedures, causing Portales

---

Employment and Wage Estimates New Mexico http://www.bls.gov/oes/ current/oes_nm.htm#25-0000 (last visited February 19, 2010).  Moreover, Meza points to no authority, and the Court finds none, that supports comparing a party's financial harm to its attorneys fees to determine if the harm is irreparable.  Rather, the essential inquiry is whether the party can recover the sum.  See Chamber of Commerce of U.S. v. Edmondson, 594 F.3d 742, 771 (10th Cir. 2010).

Schools to suffer harm to its carefully planned lines of authority.

Moreover, under state law, Portales Schools' Superintendent and the School Board bear the burden of ensuring that staff who work with children are appropriately qualified and supervised, that staff maintain professional standards, and that staff have passed background checks that include fingerprinting and criminal background checks. See NMSA 1978, § 22-10A-5 (background checks; known convictions; alleged ethical misconduct; reporting required; limited immunity; penalty for failure to report). The DPHO's order requires that Portales Schools permit the consultant team, members of which are unknown to Portales Schools, to enter school grounds and work in M.P.'s classroom. See Order ¶ 2, at 23 ("The consultant team will be given access to this decision, to Student's educational records, to District staff, to Parent, and to Student and will be permitted to observe in Student's classroom . . . ." (emphasis added)); id. ¶ 7, at 24 ("The consultant team will provide hands on assistance and training to Student's teachers and will remain actively involved, returning to Portales Schools regularly to observe and measure Student's progress, and to make any changes necessary to ensure that Student's program remains appropriate."). Portales Schools is thus potentially exposed to civil liability, because the Order requires it to allow the Consultant Team to access M.P.'s classroom without regard to the safeguards that are in place to protect school children.

Meza contends that the IDEA prohibits regulations and policies that do not conform to the IDEA. See 20 U.S.C. § 1407(a)(1). Meza's argument is founded on the assumption that the DPHO's Order is appropriate under the IDEA. If the DPHO's Order exceeds her statutory authority under the IDEA, however, the DPHO -- and not the IDEA -- mandates that Portales Schools violates its policies and state law.

Moreover, Portales Schools faces irreparable financial harm from implementing the order.

Portales Schools would likely be unable to recoup costs associated with implementing the Order if it prevails in this case.  See Susquenita Sch. Dist. v. Raelee S., 96 F.3d at 83 ("[W]e conclude that a school district may be required to pay for tuition and expenses associated with a pendent placement prior to the conclusion of litigation."); Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings, 903 F.2d at 641 (holding that, although a child was placed unilaterally by his parents in an acute care facility, once the parents had obtained an administrative ruling identifying the facility as the appropriate pendent placement, the school district was absolutely obligated to pay for that placement pending conclusion of the judicial proceedings).  The Tenth Circuit has held in the context of preliminary injunctions that "monetary damages that cannot later be recovered" are an irreparable harm.  Chamber of Commerce of U.S. v. Edmondson, 594 F.3d at 771.  See, e.g., Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs., 31 F.3d 1536, 1543 (10th Cir. 1994)("Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the . . . plaintiffs' injury was irreparable."); Greater Yellowstone Coal. v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003)("An irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."  (quotation and emphasis omitted)).  See also Ohio Oil Co. v. Conway, 279 U.S. 813, 814 (1929)(holding that paying an allegedly unconstitutional tax when state law did not provide a remedy for its return constituted irreparable injury in the event that the statute were ultimately adjudged invalid).  The unrecoverable expenditure of funds, thus, amounts to an irreparable harm.

        Meza responds that Portales Schools may be able to recover the funds.  Her argument is unavailing.  Meza does not offer to post a bond or otherwise represent that she can or will pay the

amount expended.  Rather, Meza asserts that Portales Schools can apply for reimbursement for the funds from the Puente Para Los Ninos Fund, the state high-risk fund established with federal IDEA funds to ensure provision of FAPE to students with disabilities whose educational costs are more than $22,956 above the average cost of educating other students.  See U.S.C. §1411(e)(3).  Even if Portales Schools' application is successful, a proposition that is unclear, if it unnecessarily expends funds from the public fisc to implement an invalid order, its ability to seek reimbursement from other federal funded state monies shifts the harm, Meza's proposal does not eliminate the harm.

Meza's contention that the Supreme Court of the United States has consistently required school districts to comply with the IDEA despite substantial costs is inapposite.  Meza's argument is again founded on the assumption that the DPHO's Order is valid under the IDEA.  The question is not whether costs alone are a reason to avoid the IDEA's strictures, but whether costs that Portales Schools cannot recoup amount to irreparable harm.

In sum, Portales Schools would suffer irreparable harm in the absence of injunctive relief. Implementing the DPHO's Order requires Portales Schools to violate state law and its policy. Portales Schools would be forced to spend monies it could not recover.  The Court concludes, therefore, that Portales Schools "will suffer irreparable injury unless the injunction issues." Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.

### C.    THE THREATENED INJURY TO PORTALES SCHOOLS OUTWEIGHS WHATEVER DAMAGE THE INJUNCTION MAY CAUSE M.P.

Portales Schools asserts that M.P. will suffer no harm if the Court issues a preliminary injunction, because he is back in school and has remained in school -- as opposed to homebound educational services -- and Portales Schools has continued to contract with experts in autism who are making regular visits to Portales and to M.P.'s classroom, and are continuing to work with

Portales Schools' staff to appropriately address M.P.'s needs.  Meza responds that, without an appropriate educational placement, M.P.'s condition is deteriorating.  She contends that, since the beginning of the school year, M.P. has been physically restrained, segregated, and sent home early, and that Meza has been asked to come to school to calm him.  Portales Schools replies that, because M.P. has long exhibited such behaviors, see Order at 2 (stating that Portales Schools' response to M.P.'s "escalating behaviors in the classroom, behaviors which included disrobing, throwing furniture, biting, kicking, and screaming" was the basis for the Meza' original complaint); id. ¶ 5, at 3 (stating M.P. exhibited these behaviors in the spring of 2009), these actions do not signify a deterioration in M.P.'s condition.  Portales Schools further presents an affidavit from Dr. Rarityin which she testified that M.P.'s educational and behavioral needs are being adequately met, and that staying the DPHO's Order will not pose any harm or risk to M.P. or his right to FAPE.  See Rarity Aff. ¶¶ 5-6, at 2.

The DPHO found that Portales Schools failed to provide M.P. with FAPE during a period when M.P. was on homebound services, because Portales Schools failed to provide M.P. with services in his least restrictive environment.  See Order ¶¶ 10, 11, at 18, 21-22.  Before the hearing and before the DPHO's issuance of her Order, Portales Schools agreed to bring M.P. back into its classrooms when school began in the fall of 2010.  Portales Schools represented that: (i) it will keep M.P. in classes at the school; (ii) it will continue to employ expert consultants in behavioral interventions for children with autism, who have devoted significant efforts toward working with M.P. and Portales Schools' staff so as to ensure M.P.'s and others' safety in the classroom; and (iii) staff are improving their ability to provide M.P. educational services.  See Affidavit of Jacqueline Burns ¶ 13, at 2 (executed November 29, 2010), filed December 3, 2010 (Doc. 8-2); Rarity Aff. ¶

4, at 2.

The DPHO also stated that, given M.P.'s worsening condition, Portales Schools was required, "at a minimum," to fully implement Dr. Rarity's recommendations for improving non-verbal communications with M.P. and determining the causes of M.P.'s behaviors.  Order at 20-21. Dr. Rarity testified that Portales Schools is now taking these measures, by addressing the staff's shortcomings in determining the causes of M.P.'s behaviors by improving the staff's data analysis, which will enable them to isolate and identify M.P.'s triggers, and Dr. Rarity has "devoted a significant number of hours and effort to working with the Student and his classroom staff so as to assist them in developing and implementing both preventative and reinforcement strategies addressing" M.P.'s behaviors.  Rarity Aff. ¶ 4, at 2.  Cf. Order ¶ 35, at 13 (finding Portales Schools failed to "turn to their expert consultants for intensive individualized assistance in addressing Student's needs").

The Court is satisfied that Portales Schools is taking measures to provide M.P. FAPE during the pendency of this proceeding.  M.P. is attending classes in the classroom.  Portales Schools is working with Dr. Rarity to train the staff to identify the causes of M.P.'s outbursts.  Dr. Rarity is also training staff preventative and reinforcement strategies to address M.P.'s behaviors.  While more may be required to compensate M.P. if the Court affirms the DPHO's decision that M.P. was deprived of FAPE, Portales Schools' corrective measures adequately address the shortcomings identified by the DPHO such that M.P. will suffer little or no harm during the pendency of this proceeding.  The Court concludes, therefore, that "the threatened injury [to Portales Schools] . . . outweighs whatever damage the proposed injunction may cause the opposing party."  Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.

**D.     A PRELIMINARY INJUNCTION IS NOT ADVERSE TO THE PUBLIC INTEREST.**

Portales Schools further asserts that, because M.P. will suffer no harm from an injunction, enjoining the DPHO's Order will benefit the public interest, which favors appropriate expenditures of tax payer monies and protection of the policies underlying IDEA.  Meza responds that IDEA recognizes a public policy of providing education to disabled students and that furthering this federal policy is paramount.  The Court agrees that the public policy of providing education is paramount; however, because M.P. is apparently receiving FAPE during the pendency of this proceeding, the pubic interest favors a preliminary injunction, because the public interest supports seeing tax dollars correctly used and the IDEA correctly implemented.

This case presents a situation in which several areas of public interest are at play.  First, there is the public interest that IDEA promotes -- that children with disabilities should be educated, to the maximum extent possible, in the general education school environment and provided with educational services that are reasonably calculated to enable them to receive educational benefit. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06; L.B. ex rel. K.B. v. Nebo Sch. Dist., 379 F.3d 966, 968 (10th Cir. 2004)(citing Daniel R.R. v. Bd. of Educ., 874 F.2d 1036 (5th Cir. 1989)); Oberti v. Bd. of Educ., 995 F.2d 1204 (3rd Cir. 1993).  Because M.P. is back in the classroom, receiving likely appropriate educational services, a preliminary injunction will serve the public interest in seeing M.P. receive educational service.

There is also the obvious public interest in ensuring that public monies are spent in accordance with applicable federal and state statutes, and at reasonable levels.  The public must trust that, especially with regard to education, increasingly sparse funds are spent wisely and well.  There is a financial risk inherent in forcing Portales Schools to implement the DPHO's order while the

appeal process plays out.  Consequently, the Court finds that "the injunction, if issued, would not be adverse to the public interest."  Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.

IV.    **THE COURT ENJOINS THE DPHO'S ORDER IN ACCORDANCE WITH PORTALES SCHOOLS' REQUEST AT THE FEBRUARY 11, 2011 HEARING.**

A preliminary injunction is warranted under the factors the Tenth Circuit set forth in Resolution Trust Corp. v. Cruce.  See 972 F.2d at 1198.  The Court, therefore, concludes that it is appropriate to enjoin the DPHO's Order, and the Court will enjoin the Order in accordance with the Portales Schools' request at the February 11, 2011 hearing.  At the hearing, Portales Schools represented that its primary concern with the DPHO's Order is that the Order gives the Consultant Team control and oversight over Portales Schools' staff, and that, under the Order, the Consultant Team displaces the IEP Team.  See Tr. at 36:17-22(Church)("We'd really like to hear that perhaps we can have UNM on the campus but they can't have all these powers that the hearing officer has given them."); id. at 36:23-37:16 (Court, Church)(Portales Schools stating that the Consultant Team's oversight and being given the deciding vote over disputes "are certainly the two major areas" of concern).  Portales Schools also has an issue with permitting the Consultant Team to interview its staff and service providers, because the Consultant Team has aligned itself with Meza in this matter, as it testified on Meza's behalf at the administrative hearing.  See Tr. at 38:6-20 (Court, Church).  Portales Schools stated that it did not have an issue with the Consultant Team having access to Portales Schools staff, observing M.P. and staff, or reviewing instructional and implementation methodologies.  See Tr. at 37:25-38:5, 39:3-11 (Court, Church).  Portales Schools further represented that it did not object to the Consultant Team making recommendations to the IEP Team, so long as the IEP Team decided whether to accept the recommendations.  See Tr. at 38:21-39:1 (Court, Church).

-36-

Accordingly, the Court enjoins the portions of the DPHO's Order that give the Consultant

Team oversight over Portales Schools, limit the IEP Team, and allow the Consultant Team to

interview Portales Schools staff and service providers.  Specifically, the Court enjoins the following

provisions in the DPHO's Order: (i) "[q]ualified members of the consultant team will . . . interview

Student's related services providers . . . ," Order ¶ 3, at 23;[5] (ii) "[i]f there is a lack of consensus on

the team as to the services needed by Student, the consultant team, so long as the Parent agrees, will

have the deciding vote," Order ¶ 6, at 24; (iii) "The consultant team will provide hands on assistance

and training to Student's teachers and . . . make any changes necessary to ensure that Student's

program remains appropriate," Order ¶ 7, at 24;[6] and (iv) "The consultant team will oversee

Student's educational program . . . [;] [a]fter that time, the IEP team will resume control,"[7] Order ¶ 8,

at 24.  Moreover, the Court enjoins the Order to the extent that it gives the Consultant Team control

or oversight over Portales Schools, its staff, and its service providers.  The Court further enjoins the

DPHO Order to the extent that it gives physical access to Portales Schools' staff, service providers,

and facilities outside of Portales Schools' control.

The Court will not enjoin the following portions -- excepting the struck out portions -- of the

---

[5] The Court is not prohibiting the Consultant Team from interviewing or talking to M.P.'s service providers, but the Court believes that the DPHO likely exceeded her statutory authority when she suggested that the consultant team could talk to the service providers without Portales Schools' permission.

[6] Again, the Court is not prohibiting the Consultant Team from assisting or training M.P.'s teachers, but the Court believes that the DPHO likely exceeded her statutory authority when she suggested that the Consultant Team could assist or train teachers without Portales Schools' permission.

[7] The Court enjoins the provision, "[a]fter that time, the IEP team will resume control," because it implies that the IEP Team surrenders control to the Consultant Team.  The Court enjoins the DPHO's Order to the extent it requires Portales Schools and the IEP Team to surrender control to the Consultant Team.

DPHO's Order:

1.     The District will contract with the University of New Mexico Center for Development and Disability to put together, with the involvement of the District and Parent, a team of consultants with expertise in autism. The team will include an expert skilled in addressing the behavior problems of children with autism, an expert in structuring educational services to children with autism, and a speech and language therapist or other expert in facilitating communication for children with autism. An important criterion in selecting members of the consultant team will be both their immediate and continuing availability for the work required in this Order.

2.     The consultant team will be given access to this decision, to Student's educational records, to District staff, to Parent, and to Student and will be permitted to observe in Student's classroom, and, if the team decides it is appropriate, and Parent consents, in Student's home.

3.     Qualified members of the consultant team will review the anecdotal data collected by Student's teachers, and perform additional extended observations in the classroom, interview ~~Student's related services providers and~~ Parent to determine the causes of Student's outbursts and other disruptive behavior, or, if that is not possible, to develop a reasonable hypothesis which will allow them to recommend changes in Student's educational program, functional behavioral evaluation, and behavior intervention plan likely to be successful in addressing Student's behaviors and in allowing Student to make educational progress.

4.     The team shall also review the instructional methodologies being used by the teachers to ensure that the methodologies used and the manner in which they are used is appropriate for Student and that these methodologies are being implemented appropriately.

5.     The team will consult with appropriate medical personnel to determine what medical evaluations, if any, are still needed at this time by Student for educational purposes, and will suggest medical providers and supervise [these evaluations] or assist District staff in supervising the conduct of these evaluations, without cost to the Parent. A psychiatric evaluation shall not be performed at this time and shall only be performed only if the modifications made based on the team's report prove unsuccessful in addressing Student's behaviors and the team, at that point, finds such an evaluation appropriate to address Student's educational needs. Informed Parent consent shall be obtained before any medical evaluation is conducted.

6.     As promptly as possible consistent with the need for observations and review

of data, without waiting for medical evaluation data, the consultant team, together with Student's IEP team, will develop a new IEP, functional behavioral assessment, and behavior intervention plan for Student.  ~~If there is a lack of consensus on the team as to the services needed by Student, the consultant team, so long as the Parent agrees, will have the deciding vote.~~

7.      The consultant team ~~will provide hands on assistance and training to Student's teachers and~~ will remain actively involved, returning to the District regularly to observe and measure Student's progress~~, and to make any changes necessary to ensure that Student's program remains appropriate~~.

8.      The consultant team will ~~oversee~~ [remain involved in] Student's educational program for a one-year period.  Visits should be monthly at a minimum after the initial intensive evaluation of Student's needs.  ~~After that time, the IEP team will resume control.~~  Of course, the IEP team should consult with autism experts of the District's choice to the extent such assistance remains necessary to provide Student a free, appropriate public education.

Order ¶¶ 1-8, at 22-24 (enjoined portions of the order are struck through).

Based on this injunction, Court would expect, but does not order, that, after reviewing M.P.'s teachers instructional and implementation methodologies, the Consultant Team will recommend modifications to the instructional and implementation methodologies.   In the process of the Consultant Team and M.P's IEP Team developing a new IEP, functional behavioral assessment, and behavior intervention plan for M.P., if there is a lack of consensus as to the services M.P. needs, the IEP Team will reach a decision in accordance with the IDEA, and the Consultant Team may consult and be consulted, but may not vote.  The Consultant Team, subject to the control of Portales Schools Superintendent, may recommend and, if the recommendation is accepted, provide hands-on assistance and training to M.P.'s teachers.  The Consultant Team will, subject to control of Portales Schools Superintendent, monitor and make recommendations to improve M.P.'s educational program for a one-year period.

**IT IS ORDERED** that: (i) Defendant Board of Education of the Portales Municipal Schools'

Motion to Stay Implementation of Due Process Hearing Officer's Decision, filed December 3, 2010 (Doc. 7), is granted in part; (ii) the Court enjoins the following provisions of the Final Decision, filed October 8, 2010 (Doc 1-1): (a) "[q]ualified members of the consultant team will . . . interview Student's related services providers . . . ," Order ¶ 3, at 23; (b) "[i]f there is a lack of consensus on the team as to the services needed by Student, the consultant team, so long as the Parent agrees, will have the deciding vote," Order ¶ 6, at 24; (c) "[t]he consultant team will provide hands on assistance and training to Student's teachers and . . . make any changes necessary to ensure that Student's program remains appropriate," Order ¶ 7, at 24; and (d) "[t]he consultant team will oversee Student's educational program . . . [;] [a]fter that time, the IEP team will resume control," Order ¶ 8, at 24; (iii) the Court enjoins the Order to the extent that it gives the Consultant Team control or oversight over Defendant Board of Education of the Portales Municipal Schools, its staff, and its service providers; and (iv) the Court further enjoins the DPHO Order to the extent that it the Consultant Team gives physical access to Portales Schools' staff, service providers, and facilities without of Portales Schools' permission.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Tara Ford
Pegasus Legal Services for Children
Albuquerque, New Mexico

-- and --

Gail S. Stewart
Steven Granberry, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for the Plaintiff/Defendant Olga Meza*

Jacquelyn Archuleta-Staehlin
Elizabeth J. Church
Cuddy & McCarthy, LLP
Santa Fe, New Mexico

     *Attorneys for the Defendant/Plaintiff Board of Education of the Portales*
      *Municipal Schools*